# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL LEE WHEELER,<br><br>              Plaintiff,<br><br>      v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>              Defendant. | Case No.  1:12-cv-01729-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL<br>SECURITY APPEAL<br><br>(ECF Nos. 18, 19, 20) |

**I.**

**INTRODUCTION**

Plaintiff Michael Lee Wheeler ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from lumbar degenerative disc disease, status post left knee arthroscopic surgery, obesity, and depression.  For the reasons set forth below, Plaintiff's Social Security

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos. 9, 10.)

appeal shall be denied.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on February 28, 2008.  (AR 17.)  Plaintiff's applications were initially denied on July 1, 2008, and denied upon reconsideration on July 22, 2009.  (AR 132-36; 141-46.)  Plaintiff requested and received a hearing before Administrative Law Judge Sharon L. Madsen ("the ALJ").  Plaintiff appeared for a hearing on November 23, 2010.  (AR 31-91.)  On January 27, 2011, the ALJ found that Plaintiff was not disabled.  (AR 14-25.)  The Appeals Council denied Plaintiff's request for review on August 8, 2012.  (AR 8-10.)

**A. Hearing Testimony**

1.     Plaintiff's Testimony

Plaintiff testified at the November 23, 2010 hearing.  (AR 36-67.)  Plaintiff was born on January 18, 1974.  (AR 37.)  Plaintiff is 5 foot 7 inches tall and weighs 208 pounds.  (AR 37.)  Plaintiff is divorced and has four children.  (AR 37.)  Plaintiff lives in a mobile home with his two youngest children, his girlfriend, her daughter and her two grandchildren.  (AR 38.)  Plaintiff receives food stamps, Medi-Cal, and disability compensation from the Veteran's Administration.  (AR 38-39.)  Plaintiff's girlfriend does not work and is also attempting to qualify for Social Security benefits.  (AR 39.)

Plaintiff graduated from high school and served in the army.  (AR 40.)  At the end of his military career, Plaintiff was in charge of distributing sports equipment and organizing sports events.  (AR 44.)  While he was in the Army, Plaintiff had surgery on his left leg and he was discharged due to his leg and knee.  (AR 53, 70.)  Plaintiff worked at ToysRUs for a few months stocking and at Swenson's Ice Cream Parlour, Wetzel's Pretzels, and Cactus Cookies doing food prep and supervising other employees.  (AR 44-46.)  Plaintiff worked fulltime for Palace Gaming as a busser making sure the concession stands had ice.  (AR 46.)  Plaintiff also worked at K-Mart for several months stocking and doing repairs.  (AR 46.)  Plaintiff was a team leader at Jack in the

1  Box.  (AR 46.)

2      Plaintiff also did deliveries and repairs for AAA Quality Services ("AAA").  (AR 46.)  At

3  AAA, Plaintiff would deliver port-a-potties, but his partner did most of the lifting.  (AR 47.)

4  After Plaintiff got to the point where he was unable to do the deliveries, he just stayed in the yard

5  and would do repairs to the port-a-potties.  (AR 48.)  Plaintiff was terminated from his job with

6  AAA because he had an accident with the company truck where he hit another vehicle.  (AR 48,

7  58.)  Plaintiff did not get another job because of the medication he was taking and pain.  (AR 58.)

8      Plaintiff is able to drive short distances.  (AR 39.)  However, at times Plaintiff gets lost

9  and has to call home for directions.  (AR 39.)  Plaintiff is able to take care of his own personal

10  needs, but is unable to put on his shoes and socks.  (AR 41, 52.)  Plaintiff washes dishes and can

11  microwave food.  (AR 41.)  Plaintiff is not allowed to do any shopping.  (AR 41.)  Plaintiff does

12  not attend church or any social functions and has no family living in the area.  (AR 42.)  Plaintiff

13  does not participate in any hobbies because he is in too much pain.  (AR 42.)

14      On a typical day, Plaintiff wakes up and takes his medicine and plays with his youngest

15  granddaughter, getting on the floor with her and playing patty-cake and such.  (AR 42.)  Plaintiff

16  will shower, watch some television and then help his children with their homework.  (AR 42.)

17  The medication Plaintiff takes makes him tired, but he is unable to nap during the day.  (AR 43.)

18  Plaintiff does not go outside to do anything because he has to climb three steps to get into his

19  trailer.  (AR 52.)  Plaintiff sleeps four to six hours per night.  (AR 66.)  Plaintiff does not work on

20  a computer, but cannot say why.  (AR 66.)

21      Plaintiff has shooting pain in his left knee that goes down his leg and his foot has the

22  sensation that it is asleep.  (AR 49.)  Plaintiff's middle, lower back hurts all the time.  (AR 50.)

23  The pain is worse when he bends over and tries to pick something up.  (AR 50-51.)  The pain is

24  also worse when he stands or sits too long.  (AR 51.)  After about 20 minutes, Plaintiff needs to

25  change positions due to pain.  (AR 51.)  Plaintiff cannot stay in one position for very long so he

26  will lie down, sit up and then walk around for a while.  (AR 43.)

27      The numbness sensation in Plaintiff's foot is constant, but the leg pain comes and goes.

28  (AR 50.)  Some days the sensation of numbness is in his whole leg, but usually it is on the front

and side front of the leg and shoots down his leg. (AR 62.) The pain is worse when he is walking. (AR 50.) Plaintiff's foot always feels like it is asleep and nothing he does makes the sensation any better. (AR 62.) Plaintiff has had a brace since 1995 and wears it when he walks. (AR 50, 63.) Plaintiff is able to walk about 30 to 40 feet without stopping and is unable to lift any weight. (AR 51.) Plaintiff has been receiving injections which help with the pain radiating down his leg for about two days and then the pain returns. (AR 53.) He has been referred for surgery, but has not seen the surgeon. (AR 53.)

Plaintiff has high blood pressure that is controlled with medication. (AR 53-54.) Plaintiff is taking Vicodin, Soma, Tramadol, and Baclaphin. (AR 54.) The medications barely take the edge off Plaintiff's back pain. (AR 54.) Plaintiff's back pain has gotten worse over the last couple of years and has become more intense. (AR 54-55.) Plaintiff was referred to a neurologist, but the doctor just increased his Lamictal. (AR 64.)

Plaintiff receives mental health treatment from Kings View for depression. (AR 55.) Plaintiff's depression causes him to withdraw from people. (AR 55.) Plaintiff gets angry because he is not able to do the activities that he used to be able to do; and he gets easily irritated if he doesn't take his Prozac. (AR 55.) Plaintiff gets along with people, but occasionally will get aggravated and mad at people for no reason. (AR 56.)

Plaintiff's girlfriend and children manage his finances for him. (AR 56.) Plaintiff has difficulty watching television due to lack of concentration; and he is unable to play most video games because they cause him to have seizures. (AR 56.) Plaintiff used to use meth, but has been clean and sober for nine years. (AR 57.)

Plaintiff began having memory problems and confusion in 2007. (AR 57.) Plaintiff has lived in Lemoore since 2001 and knows the area, but when he goes out he cannot remember what he was going to do. (AR 58.) On occasion, he has to call home and talk to his girlfriend to find out where he was supposed to be going and what he was supposed to do. (AR 59.) Plaintiff had an MRI of his brain due to the memory loss and confusion; and Dr. Redding told him that the fluids in his brain do not flow right. (AR 59.) Plaintiff has had a new phone number for a couple of months and is unable to remember it. (AR 59-60.) It took Plaintiff a year to remember his

4

1  address.   (AR 60.)   On occasion, Plaintiff has forgotten who his children were, where his
2  girlfriend was, or why he is in his house.   (AR 60.)   Plaintiff has had these types of severe
3  episodes about once a month since he stopped working at AAA.  (AR 60-61.)

4      Plaintiff stated is unable to work because he would probably give the wrong change, or
5  get to work and not know what he was doing there and the pain would be too much for him to
6  stand or do anything.  (AR 61.)  Plaintiff has been having seizures twice a week for two years and
7  is unable to function for one to two hours when they occur.  (AR 65.)  Plaintiff had a study for
8  sleep apnea.  (AR 65.)  He was supposed to receive a CPAP machine, but has not received it.
9  (AR 66.)

10      2.      Vocational Expert's Testimony

11      Mr. Dachelet, a vocational expert ("VE"), also testified at the hearing.  (AR 66-77.)  The
12  VE testified that Plaintiff's prior jobs were semi-skilled with medium physical demand or
13  unskilled with light physical demand.  (AR 68-69.)  The VE was presented with a hypothetical of
14  an individual of Plaintiff's age, education, and work experience who was able to lift and carry 20
15  pounds occasionally and 10 pounds frequently; could sit, stand, or walk 6 hours with occasional
16  stooping, crouching, crawling, climbing, squatting, and kneeling; and was able to perform simple
17  routine tasks.   (AR 70-71.)   The VE opined that this individual would be able to perform
18  Plaintiff's prior job in the fast food industry.  (AR 71.)

19      The VE was then presented with a second hypothetical with the same criteria as the first,
20  except that this individual had a sit/stand option and due to seizure precautions must avoid
21  working at heights, dangerous machinery, open bodies of water, and climbing ladders, ropes, and
22  scaffolds.   (AR 71.)   The VE opined that this individual would be unable to perform any of
23  Plaintiff's prior jobs, but would be able to work as a garment sorter, with 7,000 jobs available;
24  canned fill machine tender, with 5,000 jobs available, and a sorter of egg produce, with 1,000 jobs
25  available.  (AR 72.)

26      The VE was given a third hypothetical with the additional limitation that this person
27  would be unable to concentrate for more than one half hour at a time.  (AR 72-73.)  The VE
28  opined that there would be no jobs available for this individual.  (AR 73.)

Plaintiff's counsel presented the VE with a hypothetical of an individual of Plaintiff's age, education and work experience who could rarely lift and carry 20 pounds and frequently lift and carry 10 pounds or less; sit 30 minutes at a time and no more than 2 hours in an 8 hour day; stand 10 minutes at a time and no more than 2 hours in an 8 hour day; sit/stand option; while seated must elevate legs 50 percent of the time; and rarely able to twist, stoop, or climb stairs.  (AR 74.) The VE opined that there would be no work for this individual.  (AR 74.)

Counsel presented a second hypothetical of an individual with the same age, education, and work experience as Plaintiff who would be absent from work three or more days per month and a third hypothetical of an individual of the same age, education, and work experience as Plaintiff who cannot maintain attention for two hour segments two hours at a time.  (AR 75.) Finally, counsel presented a fourth hypothetical of an individual the same age, education, and work experience as Plaintiff who would require special or additional supervision not given to other workers.   (AR 76.)   The ALJ opined that there would be no work for any of these individuals.  (AR 75-76.)

3.      Janette Moore's Testimony

Janette Moore is Plaintiff's girlfriend.  (AR 78.)  They have lived together for four years. (AR 78.)  She lives with Plaintiff in a mobile home with her daughter, her daughter's two children, and Plaintiff's two children.  (AR 78.)  Plaintiff spends his day standing up and leaning on something.  (AR 79.)  Plaintiff is unable to bend over and cannot sit for very long because of the pain.  (AR 79.)  Plaintiff spends his day watching television and playing certain video games. (AR 80.)  Plaintiff is unable to play some video games because of his seizures.  (AR 80.)

Once a month, Plaintiff spends about five minutes cutting the bushes outside.  (AR 80.) The bushes are about five feet high so he will stand on a stool to cut them using an electric hedge trimmer.  (AR 81.)  On occasion, Plaintiff will vacuum.  (AR 81.)  The children do a lot of the chores.  (AR 81.)  Plaintiff and Ms. Moore do not go anywhere because they do not have money; and she will complain that she hurts by the time they get to where they are going.  (AR 82.) Plaintiff used to paint miniature men, but he stopped doing that.  (AR 82.)  Ms. Moore cooks for the family.  (AR 82.)  Plaintiff's daughter and Ms. Moore's daughter do the laundry.  (AR 82.)

Ms. Moore sets out Plaintiff's medication so he will not forget to take it or take more than is prescribed.  (AR 83.)  Plaintiff forgets what he has done and he will get lost when he goes out.  (AR 83.)  Sometimes he will forget his name and age.  (AR 84.)  He is unable to read.  (AR 84.)  Approximately three times over the past four years, Plaintiff was in a lot of pain and forgot who she and the children were.  (AR 84.)  He will complain that he does not want to go for physical therapy thinking he is still in the Army.  (AR 84.)

Plaintiff is not allowed to handle his money because he spends it on things he does not need.  (AR 85.)  Plaintiff's medications make him tired all the time.  (AR 85.)  Plaintiff snores so loud at night that Ms. Moore has to wear earplugs and he gets up several times a night.  (AR 86.)  Plaintiff is unable to work because he cannot sit or stand for any length of time.  (AR 86.)  Plaintiff does not like other people and will decide he does not like someone for no reason.  (AR 87.)

Plaintiff has seizures every day where he will start twitching and then get hunched over and cannot move.  (AR 88.)  When this occurs, Plaintiff will go in and take a shower. (AR 88.)  Ms. Moore has to help him get his shirt off and get in the shower.  (AR 88.)  After having a seizure, Plaintiff will lay down for an hour or so depending on how strong the seizure was.  (AR 89.)

Plaintiff went to see a doctor in Tulare who increased his medication and told him to get more sleep.  (AR 88.)  Plaintiff got mad and did not go back to see the doctor.  (AR 88.)  Plaintiff does not make phone calls stating that that is why he has Ms. Moore.  (AR 89.)  Plaintiff gets dizzy a lot and will fall down.  (AR 90.)

**B.  ALJ Findings**

The ALJ found that Plaintiff has the following severe impairments: lumbar degenerative disc disease, status post left knee arthroscopic surgery, obesity, and depression.   (AR 19.)  Plaintiff does not have an impairment or combination of impairments that meet or medically equal a listed impairment.  (AR 20.)  Plaintiff has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently and can sit, stand, and/or walk for 6 hours each in an 8 hour day.  Plaintiff can occasionally stoop, crouch, crawl, squat, and kneel.  Plaintiff has

the ability to perform simple, routine tasks.  (AR 21.)  Plaintiff is able to perform his past relevant work as a fast food worker.  (AR 24.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled.  20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004).  The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error."  Hill v.

1  Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).  "Substantial evidence" means more than a scintilla,

2  but less than a preponderance.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal

3  quotations and citations omitted).  "Substantial evidence is relevant evidence which, considering

4  the record as a whole, a reasonable person might accept as adequate to support a conclusion."

5  Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health &

6  Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

7  "[A] reviewing court must consider the entire record as a whole and may not affirm

8  simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting

9  Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  However, it is not

10  this Court's function to second guess the ALJ's conclusions and substitute the court's judgment

11  for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

12  susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

13  upheld.").

14                                                  **IV.**

15                                 **DISCUSSION AND ANALYSIS**

16  Plaintiff contends that the ALJ erred at step four because the physical and mental residual

17  functional capacity assessment is not supported by substantial evidence in the record.  (Plaintiff's

18  Opening Brief 11-20, ECF No. 18.)  Defendant argues that the ALJ properly assessed Plaintiff's

19  physical and mental residual functional capacity, reasonably rejecting the opinion of Plaintiff's

20  treating physician, and found that Plaintiff could perform simple routine tasks.  (Defendant's

21  Responsive Brief 8-13, ECF No. 19.)  Plaintiff replies that the ALJ did not clarify the question of

22  the position that Plaintiff rode in when on his motorcycle and this discrepancy should have been

23  addressed prior to discounting Plaintiff's limitations.  (Plaintiff's Reply Brief 4, ECF No. 20.)

24       **A.     Plaintiff's Physical Residual Functional Capacity**

25  Plaintiff argues that the ALJ erred by rejecting the opinion of Plaintiff's treating

26  physician, Dr. Redmond.  (ECF No. 18 at 14-16.)  Defendant responds that the ALJ properly

27  considered that the clinical findings demonstrated generally mild abnormalities and Plaintiff's

28  daily activities are not inconsistent with the ability to perform a reduced range of work.  (ECF No.

19 at 8-9

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).  In general, a treating physician's opinion is entitled to greater weight than that of a nontreating physician because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual."  Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995) (citations omitted).  If a treating physician's opinion is contradicted by another doctor, it may be rejected only for "specific and legitimate reasons" supported by substantial evidence in the record.  Ryan v. Commissioner of Social Sec., 528 F.3d 1194, 1198 (9th Cir.) (quoting Bayless v. Barnhart, 427 F.3d 1121, 1216 (9th Cir. 2005)).

Where the treating physician's opinion is contradicted by the opinion of an examining physician, who based the opinion upon independent clinical findings that differ from those of the treating physician, the nontreating source itself may be substantial evidence, and the ALJ is to resolve the conflict.  Andrews, 53 F.3d at 1041.  However, if the nontreating physician's opinion is based upon clinical findings considered by the treating physician, the ALJ must give specific and legitimate reasons for rejecting the treating physician's opinion that are based on substantial evidence in the record.  Andrews, 53 F.3d at 1041.

The ALJ found that the medical records showed that Plaintiff had received treatment for back and knee pain for years prior to his alleged onset date and continued to work until June 2007 despite these symptoms; Plaintiff had transitional lumbosacral vertebra and degenerative changes of the lumbar spine with normal range of motion in his lumbar spine and all lower extremity joints with no neurological defects; and Plaintiff received conservative treatment.  (AR 22.)  The ALJ also found that Plaintiff received pain medication, physical therapy, and injections with little change and that, contrary to the April 2010 evaluations by Dr. Redmond, the medical record indicates that Plaintiff continued to do fine.  (AR 22.)

1.     Plaintiff's Subjective Complaints of Pain

Plaintiff argues that, although the medical records state that Plaintiff was doing fine, he was complaining of pain levels of between six and eight out of ten, and the fact that he was doing

fine is not inconsistent with Dr. Redmond's findings.  This Court's task is not to re-weigh the evidence but to determine whether the ALJ's decision is supported by substantial evidence and free of legal error.  The Court is to review the reasons expressed by the ALJ in coming to a decision and determine whether the reasons for the decision were specific and legitimate.

Plaintiff argues that the physician's findings that Plaintiff was doing fine are not contradictory to finding that Plaintiff is disabled.  However, the medical reports support the ALJ's finding that Plaintiff's medications were effective in treating Plaintiff's complaints of pain which contradicts the opinion of Dr. Redmond. [2]

During the period at issue here, Plaintiff was seen at the Veteran's Administration ("VA") and was consistently found to have a normal gait; tenderness in his spine at L1-3; normal reflexes and sensory; extremities with full range of motion and normal muscle power and tone,  (AR 358, 372, 376, 382), or to have no abnormal findings other than tenderness in his spine, (AR 768, 778, 784, 789, 792, )  On September 27, 2007, Plaintiff reported that his medication was controlling his pain.  (AR 482.)  On October 16, 2007, Plaintiff reported that his pain was controlled with Vicodin taken every six hours.  (AR 475.)

On June 24, 2008, Plaintiff was examined by Dr. Grandhe who found restrictions in Plaintiff's spine, but noted that Plaintiff showed no pain behavior.  Plaintiff received an epidural

---

[2] Although Plaintiff did consistently rate his pain level as eight out of ten, review of the record demonstrates inconsistencies in the reports of pain that Plaintiff was reporting.  For example, Plaintiff's initial physical therapy appointment was on July 23, 2010.  At that time he reported that his pain was five out of ten.  (AR 701.)  On September 9, 2010, Plaintiff reported that he had a twenty-five percent improvement since he started physical therapy and was having less pain, however, he stated his pain level was eight out of ten.  (AR 689.)  Additionally, although Plaintiff complained of his pain level increasing, he has been reporting his pain level at eight out of ten or higher since 2007.  (AR 382, 829, 370, 481, 478, 475.)

Similarly there are other instances in the record where Plaintiff's self-reported pain level is inconsistent with the physician's findings.  On October 2, 2008, Plaintiff reported that Vicodin and Soma are controlling his pain, yet he rated his pain as eight out of ten.  (AR 482.)  On August 13, 2008, Plaintiff stated that he was doing well without any complaints of back pain, yet he reported his back pain as five out of ten.  (AR 462.)  On March 2, 2009, Plaintiff stated that the Vicodin was effective in reducing his pain, but reported his pain level as six out of ten.  (AR 787.)  On July 8, 2009, Plaintiff stated his pain level was five, on August 6, 2010, Plaintiff stated his pain level was eight, and on September 2, 2009 he stated his pain level was five, yet at each of these visits he reported there was no change in his symptoms.

On August 18, 2010, Plaintiff rated his pain at eight out of ten, yet on August 23, 2010, he complained that his pain had been increasing for two days and reported his pain level at eight out of ten.  (AR 696, 694.)  On October 4, 2010, Plaintiff reported that his back and knee pain were well controlled on medication and described his pain level as seven out of ten.  (AR 767-68.)

injection.  (AR 496.)  During July and August 2008, Plaintiff reported that his pain management was stable and had no complaints of back pain.  (AR 643, 462, 524.)  While Plaintiff reported pain at follow-up visits, notes from his August 8, 2008 psychiatric follow up show that he reported that his pain management and depression were stable and his medication was effective.  (AR 643.)  On September 13, 2008, he reported no back pain and did not attend several follow up appointments with Dr. Grandhe due to lack of transportation.  (AR 457, 459, 461, 524.)

Dr. Naqvi examined Plaintiff on January 16, 2009, and the straight leg raise was negative for any pain radiating down his lower extremities.  (AR 792.)  On March 2, 2009, Plaintiff stated that the Vicodin was effective.  (AR 784.)  During July and August 2009, Plaintiff reported no change in his symptoms.  (AR 568, 570, 572.)  On September 9, 2009, Plaintiff reported that his low back and knee pain had been controlled and stable.  (AR 778.)  Plaintiff stated that his back was essentially "status quo" on November 13, 2009.  (AR 563.)

In March and April 2010, Plaintiff reported that he was feeling fine.  (AR 553, 555.)  Plaintiff reported that he was feeling fine and his pain was well controlled with Vicodin and Soma on June 4 and June 30, 2010.  (AR 544, 546.)  On October 4, 2010, Plaintiff reported that his pain was well controlled with the current regimen.  (AR 767.)

The ALJ is not required to believe every allegation of disabling pain, and this is true even where there is medical evidence that the claimant has an ailment that can reasonably be expected to produce some pain.  Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).  Although Plaintiff has consistently reported his pain level at six or higher, the ALJ found that Plaintiff was not fully credible and Plaintiff does not appeal that finding.  There is substantial evidence in the record to support that Plaintiff's pain was well controlled on his medication.

2.      Plaintiff's Daily Activities

The ALJ found that Plaintiff's daily activities are consistent with the ability to perform light work.  (AR 23.)  Although Plaintiff did not raise this issue, Defendant addresses it in the opposition arguing that the ALJ reasonably inferred that Plaintiff may be capable of performing the basic demands to perform unskilled work on a sustained basis.  (ECF No. 19 at 8-9.)  Plaintiff responds that the fact that he performs certain activities does not demonstrate that he can sustain

1   work.  (ECF No. 20 at 4.)

2      The ALJ found that Plaintiff's daily activities are consistent with the ability to perform

3   sustained work.  The ALJ considered that Plaintiff watched his children, did household chores,

4   rode a motorcycle, went out alone, drove, walked, shopped in stores, watched movies and

5   television, and painted, and was noted to be good at following written instructions.  (AR 23.)

6      Plaintiff's reports of his daily activities are inconsistent, which the ALJ addressed in

7   making the finding that he is not fully credible. [3]  (AR 23.)  At the November 23, 2010 hearing,

8   Plaintiff testified that he has "three steps to get in my house, which makes it why I don't go out

9   and do anything."  (AR 42.)  However, the record shows that Plaintiff watches the children and

10  during the summer takes them to the pool Tuesdays through Sundays and watches them swim.

11  (AR 249, 256, 257, 276, 284.)  Plaintiff vacuums every day, does dishes, light housework, makes

12  lunch, and rides a motorcycle.  (AR 247, 253, 255, 277, 278, 285, 286, 289.)

13     During the day, Plaintiff watches television, plays video games, and plays with the kids.

14  (AR 80, 279, 283.)  Plaintiff plays with his dogs, walks and waters them, occasionally feeding

15  them or going to the dog park.  (AR 279, 284, 287.)  Once a month, Plaintiff trims the bushes

16  outside of his trailer.  (AR 80.)  The bushes are about five feet high so he will stand on a stool to

17  cut them using an electric hedge trimmer.  (AR 81.)  Plaintiff goes to the video store and grocery

18  store on a regular basis, shops, picks up his medications weekly, and goes to doctor's

19  appointments every month.  (AR 248, 248, 279, 286, 287.)  Plaintiff is good at following a list of

20  instructions and his girlfriend will give him a list of the things that he needs to get.  (AR 250, 258,

21  278.)

22     Additionally, the ALJ considered that Plaintiff's girlfriend testified that he cannot stand

23  and if he leans down he needs help to get up, but Plaintiff testified that he plays on the floor with

24  his granddaughter.  (AR 23.)  During the November 23, 2010 hearing, the ALJ asked Plaintiff to

25

26  [3] To the extent that Plaintiff is attempting to argue the issue of the ALJ finding that Plaintiff is not credible, this was
    not raised in the moving papers.  Reply papers should be limited to matters raised in the opposition papers.  The
27  Court will not address issues that are raised for the first time in the reply brief.  Zamani v. Carnes, 491 F.3d 990, 997
    (9th Cir. 2007).  The Court shall address the issue of Plaintiff's daily activities as it relates to the ALJ's evaluation of
28  the medical records.

1    describe what he did on a typical day.  Plaintiff responded he '[k]ind of play[s] with the youngest

2    granddaughter.  I'll get on the floor and make her do pattycake and stuff like that."  (AR 42.)

3          There is substantial evidence to support the ALJ's finding that Plaintiff's daily activities

4    are inconsistent with the limitations imposed by Dr. Redmond in the April 2010 evaluations.

5          3.     ALJ's Duty to Develop the Record

6          Plaintiff was seen at Central Valley General Hospital in 2010 and the medical record notes

7    "Pt rides a motorcycle in flexed posture?"  (AR 689.)  Plaintiff argues that the ALJ relied on the

8    fact that Plaintiff rode his motorcycle and it was error for the ALJ to fail to address this

9    inconsistency in the record.  (ECF No. 20 at 4.)

10         When applying for disability benefits, the claimant has the duty to prove that he is

11   disabled.  42 U.S.C. § 423(c)(5)(A).  The ALJ has an independent "duty to fully and fairly

12   develop the record and to assure that the claimant's interests are considered."  Widmark v.

13   Barnhart, 454 F.3d 1063, 1068 (9th Cir. 2006) (quoting Brown v. Heckler, 713 F.2d 441, 443 (9th

14   Cir. 1983)).  The ALJ has a duty to further develop the record where the evidence is ambiguous

15   or the ALJ finds that the record is inadequate to allow for proper evaluation of the evidence.

16   Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001); Tonapetyan v. Halter, 242 F.3d 1144,

17   1150 (9th Cir. 2001).

18         Plaintiff contends that the question mark in the chart notation questioned whether Plaintiff

19   rode his motorcycle in a flexed position and the ALJ had a duty at the hearing to address this

20   issue prior to discounting his limitations due to it.  In this instance, the ALJ considered the totality

21   of the activities that Plaintiff engaged in to determine Plaintiff had the capacity to perform

22   sustained work.  The position in which Plaintiff rode when on his motorcycle does not create an

23   ambiguity that would preclude the ALJ from properly evaluating the totality of Plaintiff's daily

24   activities.  The ALJ did not err by failing to determine the position in which Plaintiff rode his

25   motorcycle.

26         4.     Dr. Redmond's Evaluations

27         The ALJ found that Dr. Redmond's evaluations of April 2010 were inconsistent with the

28   medical record indicating that Plaintiff continued to do fine.  (AR 22.)  In April 2010, Dr.

1    Redmond completed a Lumbar Spine Residual Functional Capacity Questionnaire (AR 530-34)

2    and Lower Spine Residual Functional Capacity Questionnaire that set forth substantially the same

3    opinion.  (AR 530-34; 535-39.)  Dr. Redmond found that Plaintiff's pain and other symptoms

4    were severe enough to interfere with attention and concentration needed to perform even simple

5    work tasks frequently.  (AR 531, 536.)  Plaintiff would be unable to perform routine repetitive

6    tasks at a consistent pace.  (AR 536).  Plaintiff could walk 20-30 yards.  (AR 531, 537.)  Plaintiff

7    could sit for thirty minutes at one time; stand for ten minutes at one time; and sit or stand/walk

8    less than two hours in an eight hour day.  (AR 532, 538.)  Dr. Redmond opined that Plaintiff

9    would need to walk for ten minutes out of every thirty minutes and to shift at will from sitting,

10   standing, and walking.  Plaintiff would also require frequent unscheduled breaks for ten minutes.

11   Plaintiff's leg needed to be elevated waist high for at least fifty percent of the time.  (AR 532,

12   538.)  Dr. Redmond also opined that Plaintiff can rarely lift twenty pounds; would rarely be able

13   to twist, stoop, or climb stairs; and could never crouch, squat, or climb ladders.  (AR 533, 538.)

14          While Dr. Redmond had been Plaintiff's treating physician, his opinion was contradicted

15   by other medical opinions and evidence.  The ALJ could reject the opinion for "specific and

16   legitimate reasons" supported by substantial evidence in the record.  Orn v. Astrue, 495 F.3d 625,

17   632-33 (9th Cir. 2007).  A physician's opinion of disability that is premised largely "upon the

18   claimant's own accounts of his symptoms and limitations may be disregarded where those

19   complaints have been properly discounted."  Morgan v. Commissioner of Social Sec. Admin.,

20   169 F.3d 595, 602 (9th Cir. 1999) (citations omitted).

21          In this instance, Dr. Redmond's opinion is contradicted by the medical records of

22   Plaintiff's other providers showing that his back and knee pain was well controlled by his

23   medication with occasional flare-ups.  Further, Plaintiff's medical records do not reflect physical

24   examination of his back or knee by Dr. Redmond and on many occasions show that physical

25   examination was deferred.  (AR 443-64, 523-95, 645-63.)  The ALJ need not accept a treating

26   physician's opinion that is brief, conclusory, and unsupported by clinical findings.  Tonapetyan,

27   242 F.3d at 1149.  Dr. Redmond's findings are not supported by his clinical findings and were

28   based upon Plaintiff's subjective complaints that have been properly discounted by the ALJ.

1          5.      Dr. Fabella's Report

2          The ALJ gave substantial weight to the opinion of Dr. Fabella because it was consistent

3   with the medical record and overall evidence of record.  (AR 23.)  Dr. Fabella examined Plaintiff

4   at the request of the Department of Social Services and issued an opinion on May 26, 2009.  (AR

5   500-504.)  Plaintiff presented complaining of pain in his back and knees.  (AR 500.)  Dr. Fabella

6   conducted a physical examination.  Plaintiff's grip strength was tested and Plaintiff was able to

7   generate 85 pounds of force using his right hand and 5 pounds of force using his left hand.  (AR

8   502)

9          Plaintiff had a normal gait and balance and did not use assistive devices for ambulation.

10  Examination of Plaintiff's back revealed no spinal or paraspinal tenderness, intact range of

11  motion with forward flexion of 110 degrees, and straight leg raising test precipitating pain in the

12  lower back without radiation."  (AR 503.)  The upper extremities were grossly within normal

13  limits.   Range of motion in the hips was within normal limits.   Knee examination revealed

14  "minimal crepitus, no effusion, and flexion of up to 150 degrees."  (AR 503.)  Plaintiff was able

15  to squat with some pain but had difficulty standing up.  Plaintiff stated that he was unable to stand

16  on his toes and heels because it hurt his back to do so."  (AR 503.)

17         Dr. Fabella found that Plaintiff had low back pain apparently secondary to degenerative

18  disc disease, bilateral knee pain with decreased range of motion and crepitus probably secondary

19  to degenerative joint disease, and hypertension which was controlled.  (AR 503.)  Dr. Fabella

20  opined that Plaintiff would be able to lift and carry twenty pounds occasionally and ten pounds

21  frequently due to lower back pain; would be able to stand and walk eight hours in an eight hour

22  day with frequent breaks; would have no sitting restrictions; required no assistive devices; would

23  be able to climb, kneel, balance and crawl only occasionally due to back and knee pain;  and

24  would be able to walk on uneven terrain, climb ladders and work at heights only occasionally due

25  to back and knee pain.  Dr. Fabella found that Plaintiff did not have hearing or seeing limitations,

26  hand use impairment, fine fingering manipulation impairment, or environmental restrictions.  (AR

27  504.)

28         Plaintiff argues that the ALJ erred in giving substantial weight to the opinion of Dr.

16

Fabella because he did not have the opportunity of reviewing the MRI to see the severity of Plaintiff's back problem.  However, the April 15, 2010 MRI showed mild degenerative disc disease, with disc protrusion at L3-4, L4-5, and L5-S1 without nerve root impingement and mild stenosis at L4-5.  (AR 519.)  There is substantial evidence in the record to support Dr. Fabella's opinion as it is consistent with the medical records showing that Plaintiff's pain was controlled by medication and he had some limited range of motion in his back and knee.  Further, Dr. Fabella's opinion was based upon his physical examination of Plaintiff in contrast to the opinion of Dr. Redmond.  Where there is contradictory evidence in the record, it is for the ALJ to resolve conflicts in medical testimony and resolve any ambiguity.  Morgan, 169 F.3d at 603.  That Plaintiff would have interpreted the evidence differently is insufficient to reverse a decision that is supported by substantial evidence.

### B.    Plaintiff's Mental Residual Functional Capacity

Plaintiff contends that the ALJ erred by rejecting the opinion of the mental health providers at Kings View Counseling Services.  (ECF No. 18 at 20.)  Plaintiff concedes that Ms. Yates is not an acceptable medical source and her opinion is not entitled to controlling weight. Plaintiff states that the evaluators from Kings View reported a longitudinal history of treatment and each assessed limitations that would preclude work due to interruptions from psychologically based symptoms.  (Id. at 19.)  Plaintiff contends that to reject the opinions that are based upon longitudinal picture of treating Plaintiff for a one time evaluator's contradictory opinion defies logic.  (Id. at 20.)

Defendant replies that, while there is no dispute that Plaintiff had significant and severe limitations, consistent with the opinion of Dr. Izzi, the ALJ reasonably concluded that those limitations would not preclude Plaintiff from performing simple and routine tasks.  (ECF No. 19 at 11.)  Defendant argues that once again Plaintiff simply disagrees with the ALJ's evaluation of the medical evidence and the question is not whether alternate interpretations are available.  (Id. at 12.)  Defendant contends that the ALJ reasonably chose to rely on the objective evidence and opinion of Dr. Izzi and the decision of the Commissioner should be upheld.  (Id. at 13.)

The ALJ found that Plaintiff's depression was treated primarily with medication and the

record reflects he does well with his medication.  (AR 23.)  While Plaintiff reported confusion and memory loss there is not an etiology indicated in the medical record.  (AR 23.)  Plaintiff reported twitches and that he takes showers to remedy this condition, but there is nothing further in the medical record.  (AR 23.)  The July 2008 CT scan of Plaintiff's head showed a mega cistern magna versus arachnoid cyst and no hemorrhage.  (AR 23.)  Clinician Juliana Yates opinion that Plaintiff would miss three or more days a month due to mental symptoms is inconsistent with the medical record and was given little weight.  (AR 23.)

     1.    <u>Treatment Records</u>

On March 7, 2007, Plaintiff appeared at his appointment calm and cheerful.  He stated that his medications continued to be effective in reducing his depressive and anxiety symptoms.  (AR 345.)  Plaintiff was seen by Dr. Bredefeld on March 9, 2007, who found that his symptoms did not meet the criteria for post-traumatic stress disorder.  Plaintiff stated that his medications had reduced his depression.  Plaintiff had fair eye contact and his answers were coherent and brief.  (AR 388.)  Dr. Bredefeld found Plaintiff to have appropriate eye contact; average activity; no abnormal movements; spontaneous speech; restricted affect; stable dysphoric[4] mood; appropriate thought content; goal directed thought processes; satisfactory attention and concentration; no distractibility; unimpaired memory; intact cognition; and poor general fund of knowledge.  (AR 392.)  Dr. Bredefeld found Plaintiff's insight and judgment to be intact and impulse control to be good.  (AR 393.)

On June 28, 2007, Plaintiff's mood was described as euthymic[5] and he reported that his medications were effective.  (AR 339.)  On November 15, 2007, Ms. Yates noted that Plaintiff was improved over the past year, although Plaintiff reported getting more upset recently.  Plaintiff was stable with normal speech and good eye contact.  (AR 335.)

On February 29, 2008, Plaintiff reported feeling flat and irritable.  Ms. Yates noted that Plaintiff was quiet and was having difficulty putting his thoughts into words.  Plaintiff was

---

[4] A mood of general dissatisfaction, restlessness, depression and anxiety.  Stedman's Medical Dictionary 598 (28th Ed. 2006).

[5] Moderation of mood, not manic or depressed.  Stedman's Medical Dictionary, supra note 4, 678.

1  oriented times three and stable, with antisocial traits.  (AR 330.)

2       A short form evaluation for mental health was completed which shows that Plaintiff was

3  last treated on April 24, 2008.  (AR 325-27.)  Plaintiff's motor activity and speech were normal

4  with no behavior disturbance.  (AR 325.)  Plaintiff was oriented in all spheres.  Plaintiff was

5  slightly distracted with impaired memory, and intelligence below average (not formally tested).

6  Plaintiff's mood was depressed, affect was flat, and thought process was goal directed. (AR 326)

7  Plaintiff showed no content delusions or preoccupations.   Plaintiff's judgment was mildly

8  impaired.  A hand written note reflects that Plaintiff was stable and chronic with fair prognosis

9  (AR 327.)  The completing physician found Plaintiff's ability to understand, remember and carry

10  out simple instructions and maintain concentration, attention and persistence was fair; ability to

11  understand, remember and carry out complex instructions, perform activities within a schedule

12  and maintain regular attendance, complete a normal workday and workweek without interruptions

13  from psychologically based symptoms and respond to changes in work setting were poor.  (AR

14  328.)

15       Plaintiff was seen on April 25, 2008, and Ms. Yates noted that his medication was

16  changed because it was making him aggressive and irritable.  Plaintiff was doing well.  He was

17  talkative, alert, and stable.  (AR 644.)

18       On June 25, 2008, Dr. Murillo conducted a psychiatric review technique and found that

19  Plaintiff had mild impairment to restrictions of daily living; mild difficulty in maintaining social

20  functioning; and mild difficulties in maintaining concentration, persistence, and pace.  (AR 437.)

21  Plaintiff was moderately limited in his ability to understand and remember and carry out detailed

22  instructions, with no other significantly limited abilities.  (AR 440-441.)

23       On August 8, 2008, Ms. Yates noted that Plaintiff's pain management and depression

24  were stable and his medication was effective.  (AR 643.)  On November 14, 2008, Plaintiff's

25  depression was noted to be about the same as always.  Plaintiff was alert, with slightly flattened

26  affect.  He was stable and his medications were effective.  (AR 642.)  On December 23, 2008,

27  Plaintiff complained of memory loss and episodes of confusion.  (AR 901.)

28       On January 20, 2009, Plaintiff complained that he gets confused at times.  (AR 900.)  On

1  February 5, 2009, Plaintiff screened positive for depression but declined treatment at the VA,

2  stating he would continue treatment with his current provider.  (AR 788.)  On February 24, 2009,

3  Plaintiff complained of confusion at times and his medication was increased.  (AR 899.)  March

4  2, 2009, Plaintiff was screened with no suggestion of depression.  (AR 785.)

5       On May 7, 2009, Plaintiff saw Ms. Yates who noted that there was no change in his

6  depression.  Plaintiff reported that he was able to focus better since his medication had been

7  increased.  Plaintiff was quiet, allowing his girlfriend to do the talking, but was laughing at his

8  grandson.  Plaintiff was found to be stable, compliant, and his medication was effective with no

9  side effects.  (AR 639.)

10       On June 2, 2009, Dr. Izzi performed a consultative examination of Plaintiff.  (AR 506-10.)

11  Plaintiff reported a psychiatric hospitalization on one occasion for being suicidal.  Plaintiff was

12  alert.  His affect was dysphoric and he stated that he did not feel anything.  There were no

13  obvious speech problems.  (AR 507)  Dr. Izzi noted no gross indications of psychosis or

14  schizophrenia and no apparent loss of contact with reality.  Plaintiff's intellectual functioning was

15  within the low average range.  (AR 508)  There were deficits in short term auditory and visual

16  memory.  Plaintiff showed good perceptual motor integration functioning.  Plaintiff was having

17  no difficulty in caring for basic hygiene.

18       Dr. Izzi opined that Plaintiff was capable of performing simple and repetitive tasks on a

19  consistent basis over an eight hour period; not likely to have problems getting along with peers or

20  be supervised in a work like setting; had limited ability to perform complex tasks on a consistent

21  basis over an eight hour period; and was capable of responding to usual work session situations

22  regarding attendance and safety issues.  (AR 509)  Dr. Izzi found that on a purely psychological

23  basis Plaintiff was capable of dealing with changes in routine work setting.  (AR 509-10.)

24       On June 4, 2009, Ms. Yates noted that Plaintiff had run out of his medication and had

25  been more irritable.  Plaintiff was alert and oriented with low energy, but talkative.  Plaintiff was

26  stable and compliant.  Medications were effective with no side effects.  (AR 638.)

27       On September 25, 2009, Plaintiff reported being more irritable.  There was no change in

28  his depression.  Plaintiff was quiet and distracted, gazing around the room and not making eye

contact.  Plaintiff's depression was noted to be stable.  Plaintiff was compliant and medications were effective with no side effects.  (AR 636.)

On January 28, 2010, Ms. Yates notes that Plaintiff's irritability had improved.  Plaintiff was quiet and less distracted.  He was evasive and gave short answers.  Plaintiff's eye contact was fair and there were no internal stimuli.  Plaintiff was stable and compliant.  Medications were effective with no side effects.  (AR 631.)  Notes for Plaintiff's appointment on April 22, 2010, are similar.  (AR 627.)

Plaintiff saw Ms. Yates on April 30, 2010; and she completed a residual functional capacity questionnaire.  (AR 514-18, 625.)  On this date, Ms. Yates notes Plaintiff was isolated and reported difficulty doing normal activities.  Plaintiff had stable relationships and was not "irratic."  (AR 625.)  Plaintiff was quiet, hesitant, and distracted.  He provided short answers. Plaintiff had fair eye contact with no internal stimuli.  Plaintiff was stable and compliant. Plaintiff's medications were effective with no side effects.  (AR 625.)

In the questionnaire, Ms. Yates stated that Plaintiff's highest GAF within the year was 60. Plaintiff was stable and improved.  He reported mild drowsiness from medications.  Plaintiff was wary, hesitant, avoids eye contact, and had sad affect.  Plaintiff's speech and thought processes were good and fluent, but at times he stopped and cannot answer questions.  Plaintiff's insight was fair and his cognition was normal.  (AR 514)  Ms. Yates opined that Plaintiff was seriously limited or unable to meet competitive standards in all mental abilities and aptitude needed to do unskilled, semi-skilled or skilled work.  (AR 516-517)  Plaintiff's ability to maintain socially appropriate behavior and use public transportation was limited but satisfactory.  His ability to interact with the public and adhere to basic standards of neatness and cleanliness was seriously limited but not precluded.  In his ability to travel in unfamiliar places, Plaintiff was unable to meet the competitive standard.  Plaintiff would need supervision to carry out basic work.  (AR 517)

Further, Ms. Yates reported that Plaintiff's impairments are likely to cause good days and bad days.  He is likely to be absent from work three or more days per month.  Plaintiff's impairment has lasted or is expected to last more than twelve months.  He is not a malingerer and

these restrictions apply as of 2004.[6]  (AR 518.)

On June 11, 2010, Ms. Yates reported that Plaintiff was quiet and distracted.  He was hesitant and provided short answers.  Plaintiff had fair eye contact and no internal stimuli.  Plaintiff was stable and compliant.  His medication was effective with no side effects.  (AR 623.)  On July 30, 2010, Plaintiff reported his mood as irritable and he had minimal recollection of distressing events.  Plaintiff's judgment was fair.  He was quiet and his speech was hesitant.  Plaintiff was stable and compliant.  His medication was effective with no side effects.  (AR 621.)

On October 4, 2010, Plaintiff was examined by Dr. Naqvi and his screening revealed no depression.  (AR 771-772.)

2.    Ms. Yates Opinion

Plaintiff concedes that because Ms. Yates is a physician's assistant she does not qualify as an acceptable medical source.  See 20 C.F.R. § 416.913(d)(1).  Therefore, the ALJ need only give reasons that were germane to Ms. Yates in rejecting her opinion.  Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012).   The ALJ gave little weight to the opinion of Ms. Yates because it was inconsistent with the medical record.

The records of Plaintiff's mental health treatment contain substantial evidence in support of the ALJ's finding that Plaintiff was stable with treatment.  The medical record does not reflect the level of impairment or symptoms reported by Ms. Yates on April 30, 2010.  While Ms. Yates reports that Plaintiff is wary, hesitant, and avoids eye contact, there are only rare or no mention of such observations in her treatment notes.  Ms. Yates consistently notes Plaintiff's eye contact as fair or good and the only mention of avoiding eye contact is on September 25, 2009.  (AR 636.)  Although Plaintiff is on occasion noted as being quiet, Ms. Yates notes that Plaintiff is hesitant only on April 30, 2010, and he is described on other occasions as talkative.  (AR 625, 627, 631, 636,  638, 639, 644.)

Ms. Yates reports that Plaintiff has sad affect, but the only mention of affect in her treatment notes is that Plaintiff had a slightly flattened affect on November 14, 2008.  (AR 642.)

---

[6] Plaintiff agrees that Ms. Yates' opinion is in error regarding the date the limitations would be effective.  (ECF No. 20 at 5.)

Ms. Yates consistently reports that Plaintiff's medication was effective, he was having no side effects, and he was stable.  Additionally, the Court notes that medical records of Plaintiff's physician visits consistently reflect that Plaintiff is found to be oriented to time, place, and person with normal affect.

Despite finding that Plaintiff's speech and thought processes were good and fluent, insight was fair, and his cognition was normal.  (AR 514)  Ms. Yates opined that Plaintiff was seriously limited or unable to meet competitive standards in all mental abilities and aptitude needed to do unskilled, semi-skilled or skilled work and that he was likely to be absent from work three or more days per month.  This opinion in not consistent with the medical examinations in which Plaintiff's medication is noted to be decreasing his depression, he presented with no depressive symptoms, and his condition was noted to be stable.  The ALJ gave reasons that were germane to Ms. Yates in rejecting her opinion, therefore, the ALJ did not err by giving little weight to the opinion of Ms. Yates.

     3.     <u>Adopting Dr. Izzi's Opinion</u>

Plaintiff contends that the ALJ erred by adopting the opinion of Dr. Izzi over the short form evaluation for mental health which shows that Plaintiff was last treated on April 24, 2008. The ALJ gave two reasons that he failed to adopt the short-form mental evaluation of Plaintiff completed by Kings View Counseling Servicing.  First, the ALJ stated that it is not consistent with the medical record which shows that Plaintiff was stable with treatment.  Second Plaintiff declined to attend a mood disorder group due to full time work.  The ALJ concluded that these reasons indicate that Plaintiff had only mild symptoms.  (AR 22.)

Although this record indicates that Plaintiff was seen on February 7, 2008 and April 24, 2008, there are no physician treatment notes from Kings View Counseling Center for these dates. (AR 325.)  The name of the doctor who completed this form and the date are not legible.  (AR 328.)  Additionally, as discussed above, the treatment records show that Plaintiff's depression was well controlled with medication and he was stable.

Specifically looking at the medical record prior to April 24, 2008, there are very few mentions of depression in the medical records.  On March 7, 2007, Plaintiff appeared cheerful

and calm.  His medications are noted to be effective in reducing his depressive and anxiety symptoms and there is no endorsement of depressive symptoms.  (AR 345.)  On March 9, 2007, Plaintiff stated his medication was effective to reduce his depression.  Plaintiff's affect was neutral.  Plaintiff was offered the opportunity to participate in group therapy but declined due to his work schedule.  (AR 388.)

On May 17, 2007, Plaintiff's screening by the VA was negative for any depressive symptoms.  (AR 383.)  On June 28, 2007, Plaintiff's mood is described as euthymic.  (AR 339.)  A contact note from Kings View Counseling Services on August 9, 2007, notes that Plaintiff's mother passed away and he was laid off from his job.  Plaintiff stated he is "getting through it." Plaintiff was stable and was to continue his present regimen.  (AR 337.)  Plaintiff mood has improved over the last year and is described as stable on November 15, 2007 and February 29, 2008.  (AR 335, 330.)

On March 10, 2008, Plaintiff was screened for symptoms of depression at the VA. Plaintiff was asked if, over the past two weeks, he had any feelings of lack of interest or pleasure in doing things or problems with feeling down, depressed or hopeless.  Plaintiff responded not at all.  (AR 362.)  On April 25, 2008, Ms. Yates noted that Plaintiff was doing well.  He was talkative, alert, oriented, and stable.  (AR 644.)

The opinion stated in the short form evaluation for mental health completed by the physician at Kings View Counseling Services is inconsistent with the medical records that show Plaintiff's depression was well controlled by medication.

The ALJ gave significant weight to the consultative opinion of Dr. Izzi because it is consistent with the medical record and overall evidence of the record.  Dr. Izzi conducted a psychological examination of Plaintiff and administered psychological tests.  Based upon the results of those tests, Dr. Izzi determined that Plaintiff was capable of performing simple and repetitive tasks on a consistent basis over an eight hour period.  Where the treating physician's opinion is contradicted by the opinion of an examining physician who based the opinion upon independent clinical findings that differ from those of the treating physician, the nontreating source itself may be substance evidence, and the ALJ is to resolve the conflict.  Andrews, 53 F.3d

24

1   at 1041.  In this instance, it was up to the ALJ to resolve the conflicting opinions of the medical

2   providers and the ALJ did not err by adopting the opinion of Dr. Izzi.

3                                                    **V.**

4                                    **CONCLUSION AND ORDER**

5            Based on the foregoing, the Court finds that the ALJ did not err in determining Plaintiff's

6   physical and mental residual functional capacity.  Accordingly,

7            IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the

8   Commissioner of Social Security is DENIED.

9            IT IS FURTHER ORDERED that judgment be entered in favor of Defendant

10   Commissioner of Social Security and against Plaintiff Michael Lee Wheeler.  The Clerk of the

11   Court is directed to CLOSE this action.

12

13   IT IS SO ORDERED.

14

15       Dated:   **September 11, 2013**              _____

16                                                    UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28